M'BRIDE *against* THE MARINE INSURANCE COMPANY.

THIS was an action on a valued policy of insurance, dated the 4th *November*, 1807, on the *American* ship *Rover*, on a voyage at and from *New-York*, to *Wilmington*, *North Carolina*, and at and from thence to *Dublin*, and at and from thence to *New-York*. A verdict was taken by consent, for the plaintiff, for 10,651 dollars and 39 cents, subject to the opinion of the court on the following case.

The *Rover* sailed from *New-York*, the 15th *November*, 1807, on the voyage insured, and arrived at *Wilmington*, the 25th of the same month, where she took in a cargo for *Dublin*. Having regularly cleared out, with all the regular and customary papers and documents, and every other requisite for the safe prosecution of her voyage, she set sail from *Wilmington*, on the 1st day of *January*, 1808; owing to contrary winds, she did not reach further than *Fort Johnson*, on *Cape Fear River*, about 30 miles below *Wilmington*, on the 5th *January*. As the ship was passing *Fort Johnson*, she was brought to, by the firing of a gun from the fort; and soon after a person came on board, from the fort, and read to the captain the act of congress, for laying an embargo on the ships and vessels, in the ports and harbours of the *United States*, which had been received at the fort the day before.

*Where the voyage insured had commenced, and the vessel was detained, by the intervention of the embargo act of the 22d December, 1807, it was held, that the insured had a right to abandon and recover for a total loss.*

The captain was forbidden to proceed on his voyage, and was compelled to come to anchor under the guns of the fort, and was prevented from proceeding further on his voyage. This was done by order of the executive of the *United States ;* and while the vessel was lying at *Fort Johnson,* an officer of a revenue cutter of the *United States,* on the 13th *January,* came on board the *Rover,* and took from the captain the ship's register and clearance.

About the middle of *April,* the vessel was moved up the river, to avoid the effects of worms on her bottom ; and about the 1st *May,* she returned to *Wilmington,* where, by the directions of the consignee, the crew were paid off and discharged. On the 14th *April,* the plaintiff made an abandonment of the vessel to the defendants, and exhibited to them the regular proofs of interest and loss ; and, in *August* following, he brought the present action against the defendants, to recover the amount insured.

*Harris,* for the plaintiff. The question arising in this case is, whether the plaintiff has a right, in consequence of the intervention of the embargo, laid by the act of congress, to abandon and recover for a total loss. The point is new and important; and, on general principles, I shall contend that the plaintiff is entitled to recover. The loss is within the general words of the policy, which is against all arrests, restraints, &c. and unless the defendants can show some rule of law that exempts this case from the operation of the general words, they must be liable.*

The case of *Rotch* v. *Edie,*† decided in the K. B. in *England,* was that of a neutral, insured in *England,* at and from a port in *France,* and detained by an *embargo,* laid by the *French* government, at *L'Orient ;* and the court, after a consideration of all the authorities, foreign and domestic, were clearly of opinion, that the plaintiff

* 1 *Burr.* 341.

† 6 *Term Rep.* 413.

was entitled to recover. It is true that Lord *Kenyon*, takes care not to deliver any opinion, as to what would be the decision of the court, where an embargo should be laid in *England* on a ship insured there. In *Green* v. *Young*,[*] Lord *Holt*, though it was not necessary to decide the point, in that case, inclined to the opinion that an embargo laid by the government of *England*, on a vessel insured there, was a peril within the policy *;* and this seems to be the inclination of the court in *Rotch* v. *Edie*, and *Robertson* v. *Ewer*.[†]

*Marshall* lays it down, that if a *British* ship be arrested or seized by the authority of the *British* government, from state necessity, it is a detention within the meaning of the policy, for which the insurer is liable *;*[‡] and this is the opinion of all the *English* elementary writers on the subject.[§] The case of *Odlin* v. *The Insurance Company of Pennsylvania*,[¶] recently decided, (*April*, 1809,) in the circuit court of the *United States*, for the district of *Pennsylvania*, is perfectly analogous *;* and the precise question now before the court was there determined. The learned judge, (*Washington*,) who delivered the opinion of the court in that case, declared, that " upon the most mature consideration which it had been in the power of the court to give in the case, they thought that upon legal principles, upon the reason and policy of the thing, and upon a fair construction of the contract, the plaintiff was entitled to recover for a total loss."

No objection can be made as to the illegality of the contract, in this case, as the voyage had commenced before the embargo was known or had taken effect.

The *nisi prius* cases of *Conway* v. *Forbes*, and *Shaw and Murray* v. *Shedden*,[**] may, perhaps, be cited against the plaintiff *;* but Lord *Ellenborough* proceeded on a principle of policy, which will not, I trust, be adopted in this court. Besides, in the case of *Page* v. *Thompson*,[††] his lordship, in a case like the present, between two *British* subjects, decided in favour of the plaintiff.

---

ALBANY, Feb. 1810.

M'BRIDE v. MA. INS. CO.

[*] 2 Ld. *Raym.* 840. 2 *Salk.* 444. S. C.

[†] 1 *Term Rep.* 127.

[‡] *Marshall on Ins.* 2d ed. 508. 510.

[§] *Evans' Essays*, p. 32. *Burn on Ins.* 133. *Annesley*, 73. *Park on Ins.* 6th ed. 109. [¶] See *Hall's Law Journal*, v. 2. p. 221. 232.

[**] *Park*, 6th ed. 609. 610.

[††] *Park*, 6th ed. 109.

*Colden* and *Hoffman*, contra. The plaintiff, it must be admitted, has the opinion of a very learned and able judge in his favour, on the very point now before the court; but we shall pursue a different course of argument, and endeavour to point out some defects in the principle on which the learned judge proceeded. In the view we take of the subject, it is not necessary to deny that the detention in this case is within the general words of the policy; for if we can show that this contract has been dissolved, or is against law, or the principles of public policy, the court will not support it.

If the act laying the embargo is perpetual, it must produce a dissolution of the contract. The terms of the act are general, without any limitation whatever. It is as permanent as any other act of congress. It is not a matter of course, that a law respecting trade must be temporary. Where a law is general and unlimited in its duration, it must be considered as permanent and perpetual, as any law, which a future legislature may have the power to alter or repeal. Judge *Washington* admits, that if an embargo were permanent, it would produce a dissolution of the contract; and it is not easy to discover how he can find any thing in the law to show it to be temporary. It may be true that embargoes laid in *England*, are equally general and unlimited in their terms. But there the king, by virtue of his prerogative, lays the embargo, and as he has no power to lay any permanent restriction on trade, it follows, of course, that the embargo must be temporary. But it would be otherwise, if such an embargo were laid by act of parliament, or the supreme legislative power of the state.

The act of the 22d *December*, 1807, is not an embargo. An embargo is a prohibition of ships sailing, on the breaking out of war, or in an actual war.* It is a measure of reprisal, or partial hostility. But the act of congress has nothing in it of a hostile nature. It allows all foreign vessels to depart from the *United States*. It is,

* *Lex Mercatoria*, 4th ed. 260. *Park*, 6th ed. 103, 104. *Marshall*, 2d ed. 508.

in terms, and effect, a prohibition of trade with *Great Britain* and *France*, without any limitation ; a local and domestic regulation, to save the property of our citizens from the chance of loss ; and not a hostile measure against a foreign nation.

The policy contains a clause that the insurers are not to be liable in case of any seizure or detention for, or on account of any illicit or prohibited trade. If the law then was permanent, it dissolved the contract. If it was a prohibition of trade, it is within the peculiar clause of the policy. The *English* policies do not contain such a clause, and the causes decided in *England* cannot, therefore, apply. *Abbott\** says, if commerce be wholly prohibited between the country to which the ship belongs and that to which she is destined, the contract of conveyance is at an end, the charter party is dissolved ; and such is the effect of a prohibition of the exportation of the particular commodities that compose the cargo, or, by the terms of the contract, are destined to compose it. He is of opinion that the same principles would apply to the same events happening after the commencement, and before the completion of the voyage, though a different rule is laid down by the *French* ordinance.

*\* Law of Shipping*, &c. 3d ed. 406.

This case cannot be distinguished, in principle, from that of *Touteng and-another* v. *Hubbard.†* The insured must be deemed to have assented to the law of the *United States*, and to which he was a party, since, as a citizen, he is a component part of the sovereignty. The loss, then, arising from this detention has happened by his own act or default. In the *nisi prius* case of *Conway* v. *Gray,‡* before Lord *Ellenborough*, he agreed with Lord *Alvanley*, that the subject must be considered as a party to the act of his government, and that, therefore, the insured, an *American* citizen, could not recover against a *British* insurer, on the ground of an embargo by the *American* government. There were two cases de-

*† 3 Bos.* and *Pull.* 291.

*‡ 1 Park,* 6th ed. 609.

cided, at the same time, on the same general principle. It is true, Lord *Ellenborough* gives no opinion what would be the effect of an insurance between two *British* subjects, in case of an embargo ; but there appears to be no difference, on the principle which he has laid down.

Again, a covenant to do an act which is lawful at the time, but which, afterwards, becomes unlawful, cannot be enforced.* Contracts or agreements which are lawful when made, may be annulled by the legislature ; for the parties are supposed to have consented to them only on the tacit condition, that they shall be dissolved, if the government throws any obstacles in the way of their performance.† It may be said, that the contract of insurance is not to do an unlawful act. But it is substantially the same thing ; for it is a contract to indemnify another for doing an unlawful act ; and thereby encourages and facilitates the doing of what is unlawful. A lawful contract for an unlawful purpose is void. A participation in carrying an illegal purpose into effect, vitiates every contract, whether primary or secondary, of which it constitutes the object.‡ As if a person is engaged in an unlawful trade, any insurance upon such illegal trade is void.§

That the voyage had actually commenced in this case, before the embargo was laid, can make no difference, as the vessel was still within the jurisdiction of the *United States* when the act passed, which rendered it unlawful for her to proceed.

Again, from principles of public policy, no contract, can be enforced, which renders it the interest of the party to violate the laws of the country of which he is a citizen. Wagers between two voters on the event of an election, or as to the articles of a treaty of peace, are illegal and void.¶ The case of a policy of insurance is equally strong ; for it encourages the insured to violate the embargo. If such a rule prevails in *England*,

* 1 *Salk.* 198.
1 *Mod.Rep.*169.
1 *Ld.Raym.*321.

† 1 *Powell on Contracts*, 445.
*Puffendorf*, L. N. and N. lib. 3. c. 7. sec. 6. and *Barbeyrac's Note*.

‡ *Evans's Pothier*, v. 2. p. 8. App.
§ *Park on Ins.* 6th ed. 309.

¶ 1 *Term Rep.* 56. 7 *Term Rep.* 535. 5 *Term Rep.* 405.

there is a stronger reason for its being adopted in this country, where every citizen forms a part of the sovereignty of the *United States*. Suppose a wager laid whether congress would lay an embargo or not, could an action be maintained on the wager? An insurance on a voyage, in case of an embargo, is in effect, the same as a wager.

*Emmet*, in reply. All the authorities and opinions, to be found in the books, without exception, are in favour of the plaintiff's right to recover. The *nisi prius* cases of *Conway* v. *Gray and others*, before Ld. *Ellenborough*, do not make any alteration of the principle, that the insured may abandon in case of an embargo. His Lordship went upon a principle of public policy only ; that where a foreign country adopts a hostile measure towards *Great Britain*, a subject of that country should not be allowed to recover against a *British* subject, in a *British* court, for a loss arising by the act of his own government. But in the case of *Page* v. *Thompson*,[*] his lordship decided that one *British* subject might recover against another *British* subject, for a loss arising from an embargo by their own government, as it was a totally different case from that between a foreign, and a *British* subject. And in a late case, that of *Visger* v. *Prescott*,[†] he decided, that an insurance of neutral property, detained by the *British* government, was lawful.

[*] *Park on Ins.*
6th ed. 109.
*Note.*

[†] *5 Esp. Cases,*
184.

If the embargo be permanent, it dissolves the charter party, and then the insurer is as much liable for a total loss of the voyage, as he would be in a case of capture. If the *embargo* is merely temporary, it is agreed that the insured may abandon. But according to the constitution of the *United States*, congress has no power to lay a perpetual embargo ; such an act would be void. In either case, then, the insured must recover.

The act operates merely on the contract to carry ; and a mistake has arisen on the other side, in confound-

ALBANY,
Feb. 1810.

M'BRIDE
v.
MA. INS. CO.

ing the contract of charter party, with that of insurance.

The arguments drawn from public policy, have no weight; for if the contract of insurance is held to be valid, it becomes the interest of the insured not to break the embargo; for if he violates the law, he is certain to lose; but if he obeys the law he will be indemnified. Insurers cannot break the law, for they are not the owners of vessels. There could be no valid policy of insurance after the embargo was laid, for there would then be no *lawful* voyage to be insured. The risk in the present case had commenced sixteen days before the act laying the embargo.

This cannot be considered in the light of a wager on the acts of government. It is not a wager that there shall be no embargo; but merely that the vessel shall proceed to sea, before any embargo takes place. Suppose it had been stipulated in the policy that if the vessel should be stopped by the embargo, the underwriters should be liable as for a total loss, could it be said, that such contract would be illegal and void? The point of policy, as well as the other questions arising in this case were fully considered by Judge *Washington*, in the case of *Odlin* v. *The Insurance Company of Pennsylvania*. It would be very inconvenient if the state courts, on questions of this nature, should differ from the courts of the *United States*; that there should be one law of insurance in this court, and another in the courts of the *United States*.

Embargoes in *England*, are sometimes limited in their duration, and are sometimes for an unlimited time. The embargo on *Swedish* vessels was unlimited; but it makes no difference as to the contract of insurance, whether the embargo is limited or not.

The clause in the policy, as to prohibited trade, applies only to a trade prohibited by the laws of the country to which the vessel is bound. A warranty as to the trade prohibited by the government of the country to

which the vessel belongs would be nugatory; for the contract would be void, in case the trade was unlawful by the laws of the *United States*.

KENT, Ch. J. delivered the opinion of the court. This was the case of a vessel detained in one of our ports, *after the voyage had commenced*, by the intervention of the embargo act of the 22d of *December*, 1807; and the question is, whether this be a detention that justified an abandonment.

There is no decision in the *English* books which comes up to the question, though the uniform language of the cases, and of the writers on insurance, is in favour of the right of the assured, in a case like the present, to abandon and recover. They make no distinction between a foreign and a domestic embargo.

The *French* writers are more explicit. They consider an embargo laid by the *French* government, on their own vessels in their own ports, as a detention within the policy, if laid after the commencement of the risk. *Valin*, *Emerigon* and *Pothier* concur in this opinion. Under the law of insurance, as they lay it down, the question before us would not be open for discussion.

In addition to this, we have a very respectable authority at home, on the point now presented. I allude to the case of *Odlin* v. *The Insurance Company of Pennsylvania*, in the circuit court of the *United States*. (*Hall's Law Journal*, vol. 2. p. 221.) Judge *Washington* went through all the cases that bear upon the question, and examined it, upon principles of law and public policy, and concluded that the assured had a right to abandon, and claim a total loss. After the clear and masterly view of the subject which was taken in that case, it becomes unnecessary to examine it here at large; and I think that I need not do much more than to declare that I yield my full assent to that opinion.

An embargo is not required to be, upon the face of the act, definite, as to time. It is frequently otherwise; and the case of the *British* embargo on vessels bound to *Leghorn*, as stated in *Hadley* v. *Clarke*, (8 *Term Rep.* 259.) is a pertinent and strong instance of the kind. But it is, from the very nature and policy of the measure, a temporary restraint. It suspends, but does not dissolve the contract of insurance, any more than the contract to carry goods. The error of the counsel for the defendants consists in considering the embargo imposed by congress, as a permanent prohibition, working a dissolution of the contract. We must judge of the act from what it purports to be, and from the terms which it uses. An embargo, *ex vi termini*, means only a temporary suspension of trade. A general and permanent prohibition of trade would not be an embargo. It would be an act too violent to be endured, and is not to be presumed. It is equally a very forced argument to liken this case to a contract to do an unlawful act, or to perform an illegal voyage. The voyage commenced before the law existed. It was not the object of the policy to violate any law. It had a contrary tendency. It was to indemnify against arrests and detentions, and not to indemnify for resistance to them. " The policy of the state," as Lord *Alvanley* observed, " is not concerned in preventing one *British* subject from insuring another against the effects of an embargo, laid by the *British* government."

The counsel referred to some recent decisions, in *England*, arising under our embargo, and which are reported in the *addenda* to *Park ;* (6th ed. p. 609.) but they will not be found, on examination, to have declared a different rule of law, as applicable to this case, from that which we deem the correct one. The court of K. B. decided that an *American* citizen could not recover from a *British* underwriter, under an abandonment founded upon our embargo, because every *American* subject was to be deemed a party to the act of congress; and shall

4

not be permitted to indemnify himself, at the expense of a *British* subject, for a loss arising from his own act. This is similar to the reasoning suggested by Lord *Alvanley* in the case of *Touteng* v. *Hubbard;* (3 *Bos.* and *Pull.* 291.) and it appears to be drawn from political considerations rather than from principles of law. Whether the courts of this and of other countries would or would not adopt a similar rule, under similar circumstances, we need not now discuss. It is sufficient in this case to say that the rule is not applicable. Lord *Ellenborough* admits that " where the insured and insurer are both subjects of the same state, the question will stand upon very different grounds of consideration." And, indeed, in *Page* v. *Thompson,* (*Park,* 6th ed. 109.) he is said to have ruled differently, that being a case between *British* subjects. When both parties belong to the same government, the act of the government is as much the act of one party as of the other, and each ought to be equally estopped from taking advantage of it, to the prejudice of the other. To consider it as amounting to an agreement between the two parties to dissolve the contract, would be pushing the doctrine to an extravagant length. A domestic embargo would, upon such a refined principle, dissolve all contracts of affreightment and for wages, contrary to the settled rule both in *England* and *France.*

The court are accordingly of opinion that the plaintiff is entitled to recover.

Judgment for the plair