1817.

*Philadelphia.*     SMITH and others *against* The Delaware Insurance

*Monday,*                                    Company.
March 31.

A seizure of American property by the French at Hamburg for a violation of a decree of the emperor Napoleon not known to the assured, prohibiting trade in certain cases, which seizure was made at a time when Hamburg was under the controul of the French arms; but when the emperor did not occupy it as an enemy, nor dissolve the government, but permitted the senate to exercise their functions, and the American consul resided there, in pursuance of which seizure the property was confiscated by order of the emperor; held, not to be within the warranty of the assured against loss arising from seizure or detention, for or on account of any illicit or prohibited trade.

THIS was an action on a policy of insurance on goods on board the ship " *Julius Henry,*" on a voyage from *Baltimore* to *Hamburg,* with liberty to touch at *Toningen.* The cargo consisted of *Havana* sugar, coffee, and tobacco, which were not the produce of nor did they come from a *British* colony. There was not among the ship's papers any certificate of origin, nor had the *French* consul at *Baltimore* any order from his government, at the time of the ship's sailing, to grant certificates of origin to ships bound to *Hamburg.* The assured warranted the goods to be *American* property, and also warranted, that the assurers should be " free from any charge, damage, " or loss, which might arise in consequence of *seizure or de-* " *tention of the goods, for or on account of any illicit or pro-* " *hibited trade.*"

The *Julius Henry* sailed from *Baltimore* the 23d *August,* 1807. She was boarded off *Heligoland,* on the 19th *October,* by the British sloop of war *Lynx,* and warned not to go to *Toningen,* the river *Eyder* being under a strict blockade. The ship proceeded to the *Elbe,* and on the 22d *October,* came to an anchor off *Cuxhaven.* She was there seized by the French military custom-house officers, and carried to *Hamburg,* where the cargo was unladen and deposited in the French custom-house stores. Every possible exertion was made by Mr. *Von Hollen,* the consignee of the cargo, to procure a restitution. He made an application to and received support from Mr. *Forbes,* the American consul at *Hamburg,* and from general *Armstrong,* the American minister at *Paris.* He employed counsel to plead the cause before the tribunal

*Query,* Whether a seizure by virtue of such decree within the French territory, and a general confiscation of all property in a similar situation, by order of the emperor in person, his tribunals not being permitted to take cognisance of it, is within the true intent of this warranty ? ·

To bring a case within this warranty, there must be both a seizure and an illicit or prohibited trade.

The prohibition must be a legal one; such as the prohibiting power had a right to make.

of prizes at *Paris*. But all in vain. The cause was not decided, as usual, by the tribunal of prizes. But the emperor *Napoleon* in person, on the 27th *January*, 1808, confirmed the seizure of this and many other cargoes, and ordered them to be sold, although general *Armstrong* was, about that time, led to believe, by official assurances, that the American property seized in the *Elbe* was in no immediate danger of confiscation. At the time of the seizure, and for a considerable time before, the forces of the emperor *Napoleon* had command of the *Elbe*, and he had established custom-houses on its waters. But the senate of *Hamburg* continued to exercise its functions, and Mr. *Forbes* resided at *Hamburg* as the accredited consul of the *United States of America*. It was proved, that the cargo belonged to the plaintiffs, who were American citizens.

The defendants rested their case on the warranty, by which they were freed from all damage on account of a loss happening by *a seizure for prohibited trade*. The seizure and condemnation in this case were, as they alleged, for a breach of a decree of the emperor *Napoleon*, of the 6th *August*, 1807, the 3d and 4th articles of which were as follows:

"*Art*. 3. Colonial produce shall be admitted only when "accompanied with a certificate of origin, of our commis-"sary for commercial regulations residing at the place of "shipment, by which it is attested, that it does not come "from or is the produce of an English colony.

"*Art*. 4. All colonial produce which is not accompanied "with the before described certificate, shall be seized and "confiscated, even where it comes from a port in which no "commissary of his majesty resides."

The cause was tried before the Chief Justice, in *February*, 1816, and he being of opinion, that the case did not fall within the plaintiff's warranty, charged the jury to that effect, who accordingly found for the plaintiffs. The defendants, conceiving that the case was embraced by the warranty, moved for a new trial.

*Margin:*
1817.

SMITH
*v.*
The Delaware
Insurance
Company.

1817.

SMITH
v.
The Delaware
Insurance
Company.

*Binney*, in support of the motion.

The warranty on which the question now turns, is peculiar to American policies. The facts prove a seizure under the decree of 6th *August*, 1807. The Emperor *Napoleon* confirmed the decree, and confiscated the property. The objections to the seizure are, 1st, That there was no actual trading. 2d, That there was no intent to trade illegally. 3d, That there was no notice, nor possibility of notice of the decree. 4th, That it was a seizure under a belligerent system. But all these circumstances have occurred in cases, adjudged to be within this warranty. On the reason of the thing, the defendants ought not to be liable; because the plaintiffs have agreed to take upon themselves the risk of prohibited trade; it matters not, of what nature the prohibition may be, whether reasonable or unreasonable. Suppose *Great Britain* should make a law, that any merchandise of the *United States*, arriving in her ports, should be confiscated. It would be most unjust, but clearly within this warranty. It is of no importance, whether the prohibition was known or not. Its being difficult to know, is one strong reason why the warranty was introduced by the underwriter. In *Faudel* v. *the Phœnix Insurance Company*, decided in the Supreme Court, *March* Term, 1815, the Chief Justice declared, that it was of no importance, whether the decree of Spain, under which the goods were confiscated, was known or not.

The British had given permission to import into the *West Indies*, certain articles from the *United States*, for six months. They afterwards reduced the time to four months, and condemned a vessel and cargo which went to *Jamaica* within the six months, without knowing of the alteration, or an opportunity of knowing.

In *Church* v. *Hubbard*,(a) it is held, that actual trading is not necessary. The law is infringed whenever the vessel attempts to trade illicitly. The decree of the 6th *August*, 1807, was a lawful decree. It was confined to territory, of which *Bonaparte* was sovereign *de facto*. *Hamburg* acquiesced in his power. He suffered the senate of *Hamburg*, it is true, to make laws such as pleased him. The form of government was permitted to remain, but matters relating to trade and commerce he took into his own hands. It is not proper to

(a) 2 *Cranch*, 232.

make a distinction between belligerent and municipal decrees. The essential distinction, is between decrees operating *infra* and *extra territorium.* I agree that this decree was unjust, and if it had been to operate on the ocean, I should say it was void. It is of no importance, that the seizure was by military officers; they were officers of the customs. The condemnation was by the emperor in person, who had the supreme power of judging. Such was the opinion of all the courts, who refused to take jurisdiction of a cause which the emperor had decided. There is no necessity for us to shew a condemnation; the warranty is against losses, occasioned by seizure. In a suit between the parties, Judge WASHINGTON held the case to be within the warranty. He cited 1 *Johns.* 20.

1817.

SMITH
*v.*
The Delaware
Insurance
Company.

*Levy,* for the plaintiffs. The question is, whether this warranty embraces those violent and unwarrantable prohibitions and seizures, which took place under the French revolution. The words illicit and prohibited, mean legally prohibited. To make a legal prohibition, there must be a legal sovereign. The construction of this contract has been judicially given; the assurer runs all risks from detentions of kings, princes, &c. and the assured, the risk of seizure for prohibited or illicit trade. In the case of *Church* v. *Hubbard,*(a) the seizure was for breach of laws more than a century old, made by the lawful sovereign of the country. But it is laid down, that a lawless seizure is not within the warranty, 2 *Cranch,* 236. It must have been justified by law; it must be such as the seizing power had authority to make; within a place where he acted under a right. In *Seaton* v. *The Delaware Insurance Company,*(b) it was held that where specie was shipped, and was known by both parties to be illicit, the underwriter runs the risk. There must be both seizure and illicit trade; seizure and condemnation under pretext of such trade, are not sufficient, unless the trade is actually illicit. *Graham* v. *The Pennsylvania Insurance Company.*(c) *Johnson* v. *Ludlow.*(d) It is admitted, that the decree of 6th *August,* 1807, would have been lawless if enforced on the ocean; for the same reason it must be so, in a place out of the jurisdiction

(a) 2 *Cranch,* 189.  (c) 1 *Marshall's Ins.* 346.
(b) 1 *Marshall's Ins.* 346.  (d) 1 *Marshall's Ins.* 346.

1817.

SMITH
*v.*
The Delaware
Insurance
Company.

of *Bonaparte*. He had no right to legislate for *Hamburg*. *Holland* became an integral part of the French empire on the 9th *July*, 1810. The *Hanse* towns were annexed on the 10th *December*, 1810. *Walsh's Review* for *April*, 1811, 84 *App*. *Bonaparte*, when this decree was passed, was not the king either *de jure* or *de facto*, in legal understanding, *Foster's Cr. L*. 184. 188. 397. 4 *Blac. Com*. 77. To make a law obligatory, it must be published to all whom it may concern. *Decretum non obligat, sed promulgatio*. Sir *Wm. Scott's* opinion, 1 *Edw*. 385. 1 *Blac. Com*. 45, 46. 7 *Johns*. 477. No French court of justice would have construed this ordinance as retrospective, and therefore, *Bonaparte* withdrew it from his courts. There was a tribunal at *Paris* to decide definitively, 1 *Edw*. 9 *App*. *Berlin* decree, article 9. and the *proces verbal* in the present case, says, that the property was to remain under seizure until the decision of the courts, to whom it belonged; meaning the council of prizes. Indeed, in *Le Caux* v. *Eden*,(a) Lord MANSFIELD declared, that, every nation was bound to establish courts of admiralty for the trial of prizes, who proceed according to the law of nations; but *Bonaparte* confiscated all the property seized in the *Hanseatic* rivers, by one sweeping order made on the 27th *June*, 1808, of which we have never had sight. Here was no trading nor intent to trade. In *Church* v. *Hubbard*,(b) there was an actual trading; and such there ought to be. The insured must be in fault, *Johnson, &c.* v. *Ludlow*.(c) 6 *Mass. Rep*. 234. The *Julius Henry* came to anchor off *Cuxhaven*, a Danish town, with a view of making inquiry, and was there seized. If the plaintiff had known the trade to be unlawful, the seizure was within the warranty; because approaching the port, in that case, would afford a presumption of an intent to trade. But not so, if the trade were not known to be unlawful; because no intent to trade could be presumed. In *Suckley* v. *Delafield*,(d) the insurer was held liable for illegal trade, barratrously carried on by the master. As to the opinion of Judge WASHINGTON, it was given without argument or authority cited on the points reserved.

(a) *Dough*.
(b) 1 *Caines' Cases in Error*, 30.
(c) 1 *Caines' Cases in Error*, 30.
(d) 2 *Caines' Rep*. 222, 3.

*Ingersoll* on the same side.

Our case is within the body of the policy; a "seizure or arrest by princes, &c." but the defendants rest on the warranty by the plaintiffs. I am content to grant, for argument's sake, that if I carry my goods to a country where their entrance is prohibited by the law of the country, it is a trading within the warranty. What law prohibited trade to *Cuxhaven?* We are told, the edict of the 6th *August*, 1807. This edict bears no date: and was not known at *Paris* in *November*, 1808. The officers who made the seizure said that it was under the 1st and 3d articles of that decree; so says the *proces verbal.* But the 3d article only forbids the admittance of the goods: the seizure, therefore, was not for the purpose of confiscation. In the *Antwerp* cases, 4 *Binn.* 430. 445. this Court has decided that underwriters were liable in case of trading against a decree of *Bonaparte.* The underwriters did not even make the objection on which they now rely. The seizure there was made under the decree of *Berlin.* The decree of 6th *August*, 1807, is said to have been made with a view of carrying into effect the decree of *Berlin.* In the *Antwerp* cases the court decided the seizure to be an act of arbitrary power. The proceeding against this vessel was not under a municipal but under prize law. Where an English ship retook an American vessel which had been seized in the river *Yadhe*, by French douaniers, for want of a certificate of origin, and was released on bail given to abide the judgment of the court of prizes, no salvage was allowed. 1 *Edw. Appx.* 265. An American vessel seized at *Bourdeaux*, under the *Milan* decree, was proceeded against as prize. *Edw. Appx.* 72. A confiscation under a regulation of trade, is never considered as prize of war. The conservative senate of *France* say that the decrees of *Berlin*, &c. were in retaliation for war measures of *England*: they called it an act of *reprisal*, 1 *Edw. Appx.* 67. By the French civil code, 5. 7. 11. 48. a law is obligatory from the moment of publication. This is the general principle of universal law, that laws can have no retrospective effect. With that view the same code provides that laws shall be executed from their promulgation: that is to say, in the capital from the day after the promulgation: and in the departments according to periods fixed, counting 20 leagues a day. Statutes against the common principles of right and reason are void. There is no forfeiture under a

1817.

SMITH
*v.*
The Delaware
Insurance
Company.

statute which it was impossible that the party could know of, although there be no proviso in the law for that purpose, *Ham* v. *M'Claws and wife.*(a)    Every foreigner is bound to know the laws of the country to which he trades, as far as concerns his own acts only, *Edw. Appx.* 309, 310.    It is said by Sir *William Scott*, that fish were not to be considered as noxious articles, because the prohibition of fish had not reached the party at the commencement of the voyage : the ignorance was invincible, and, therefore, there was no confiscation, *Edw. Appx.* 311. 407. 412. By the convention of 1800, with *France*, art. 20, in all cases where vessels are captured or detained, there shall be no sale till they are condemned by proper authority.    By art. 22, There shall be regular proceedings in the Court of Admiralty.    It is no answer, when we call for a law to shew us an act of state.    The emperor interfered, and ordered things at his will and pleasure.    If this decree had been promulgated according to the French constitution, the council of prizes would have taken cognisance of it.    The established Courts are to take cognisance of prizes ; and property captured and not carried to adjudication, ought to be considered as practically taken. *Bee's Rep.* 323. 325.    When this ship was seized, she was sailing with all proper papers, and guarded by treaty with *France*.    In order to make her liable to confiscation by the decree of 6th *August*, 1807, it must appear, 1. That *Bonaparte* had conquered the *Elbe*, whereas *Denmark* was at peace with *France*, and had a right to the navigation of the *Elbe*.    2. That notice of the decree was given.    In all belligerent decrees notice is necessary. He further cited, 1 *Edw. Appx.* 6. 14. 61.    *Lang* v. *United States Insurance Company.*(b)    *Smith* v. *Delaware Insurance Company.*(c)

*Rawle*, in reply.    If this were even the first time in which the underwriters had brought forward this warranty in a similar case, it ought not, therefore, to prejudice this cause. They are as much dissatisfied with the violence and injustice of foreign powers as the assured.    The general rule is, that warranties are to be construed strictly against the warrantor. The facts are not complicated.    It is immaterial, whether the seizure was in legal form.    The warranty is against de-

(a) 1 *Bay.* 96. 98.        (b) 2 *Johns. Cas.* 179.        (c) 7 *Cranch*, 434.

tention as well as seizure. It is of no consequence, whether the military were employed or not. The only question is, whether the trade was prohibited by the supreme power of the country. The objection, that the plaintiffs had no notice of the decree is equally immaterial. The clause of warranty was introduced in 1788, and extends to all kinds of prohibitions, whether known or unknown. It is objected, that the decree was extra-territorial. What are the facts? The banks of the *Elbe* were certainly under the authority of *Bonaparte*. There is no trace of authority exercised by *Hamburg* independently of him. The battle of *Jena* decided the fate of *Prussia* and *Hamburg*. *Bonaparte* was king *de facto*, although these countries were not annexed to *France* till some time after; *Holland*, by the decree of *Rambouillet*, 9th *July*, 1810; and the *Hanse* towns, by the decree of the conservative senate on the 10th *December*, 1810. But these countries were conquered, and governed by *Bonaparte* long before. *Cuxhaven* formerly belonged to *Hamburg*, and was also conquered by *Bonaparte*. Admitting that promulgation is necessary to a decree, there is evidence of promulgation at *Hamburg* of the decree of the 6th *August*, 1807. It is objected, that this law is retrospective. By the civil law the prince may pass a retrospective law, provided he does it expressly. 7 *Johns. Rep.* 504. But the decree of the 6th *August*, 1807, is not retrospective. It applies only to vessels arriving after its date. 8 *Mass. Rep.* 308. 4 *Cranch*, 241. An actual trading is not necessary. *Church* v. *Hubbard*. In that case there was no intention to trade, but what might be implied from arriving with a cargo. As to the condemnation, the mode is immaterial, if the imperial court had jurisdiction. The emperor united in his person all functions, executive, legislative, and judicial, and a purchaser would have acquired a title indefeasible in *France*. But a condemnation is not necessary for our defence; it is sufficient if the loss claimed by the plaintiff was occasioned by prohibited trading. The policy contemplates a loss before condemnation, for the plaintiffs are not to abandon for sixty days unless sooner condemned. The convention of 1800, does not render all subsequent laws of *France* or this country a nullity. The 6th article reserves a right to make regulations in port, provided each be put on the footing of the most favour-

Vᴏʟ. III.—L

ed nations, and it does not appear that any nation was more favoured than we. In giving notice, the British were more liberal than the French ; but they might have dispensed with it if they pleased. The voyage is at the risk of the neutral, and he must determine for himself. This seizure is called a military outrage ; but we cannot select this from other results of the exercise of military dominion for many years. The commercial regulations of the emperor all bore a military character. His soldiers performed the duties of civil officers. ·

TILGHMAN C. J. (After stating the case.) I have made inquiry, at what time this ·clause of warranty was introduced into our policies of insurance, and it appears, that it was not inserted before the year 1788. It was probably adopted about the middle of that year. Disputes had arisen between the underwriters and assured, concerning losses by seizure, for breach of the revenue laws of foreign countries. The assured contended, that unless those laws were known to them, the underwriters were liable. To prevent these disputes, the clause in question was introduced. To bring a case within the warranty, there must be both a seizure and an illicit or prohibited trade. It is not enough that a seizure is made, on an allegation of prohibited trade. It must be proved, that there was a prohibition, and that the case is within it. And it must be a *legal* prohibition, such as the prohibiting power had a right to make. There was a time when *all. foreign commerce* was prohibited to the *United States*. *England* prohibited all trade to the ports of *France* or her allies ; and *France* prohibited all trade to *England* or her colonies. They divided the world between them. But it was never supposed, that these prohibitions discharged the underwriters from loss by capture at sea, for breach of them. That has been given up by the counsel for the defendant. They confess, that such decrees are void, so far as they operate on the ocean. But they contend that every sovereign, may lawfully make any decree, to take effect *within his territory*. To give force then, to the decree of the 6th *August*, 1807, it must be shewn, that *Hamburg* was, at the time of making it, within the territory of the Emperor *Napoleon ;* and, moreover, to bring this case within the plain-

tiff's warranty, it must be shewn that the seizure was made, in consequence of a breach of that decree. The *Julius Henry* sailed from *Baltimore* the 22d *August*, but 16 days after the *date* of the decree, to say nothing of the time of its publication, an essential circumstance, concerning which the evidence is very imperfect.  Now, can a case of this kind, upon any principle of fair construction, be brought within the penalty of the law ? a case, in which a neutral is called upon, to do things which are impossible.  In the first place, it was impossible that the decree should have been known at *Baltimore*, when the ship sailed ; and in the next place, if it had been known, it could not have been complied with, because the French consul had no authority to grant certificates of origin in such case.  It is very true, the 4th article expresses, that there shall be a confiscation, for want of the certificate of origin, although the ship came from a port in which no commissary of the emperor resided.  But it cannot be inferred from this, that the decree was intended to operate before there was a possibility of knowing it.  There being no consul at the port, might be a hardship, but no insuperable difficulty would occur in the *United States*, provided the decree was *known;* for then, the merchants might take care to make no shipment, but from a port where a consul resided. From the nature of the decree, it must be supposed, that the French consuls would be ordered to grant certificates of origin in all neutral countries, and, therefore, the penalty ought not to be applied to cases, where ships sailed, before the consuls had received instructions to grant the certificates. But it is said, that the courts of every country, best know the meaning of their own laws.  I grant it, and had this cargo been condemned by the tribunal of prizes, however severe the construction they put upon this law, it would have been difficult to gainsay it.  But it was not so.  The emperor would not suffer his tribunals to take cognisance of the case.  What order he made, we have *heard,* but have *not seen;* for no copy of his decree has been produced ; but the evidence is, that by one sweeping denunciation, he confiscated all the American property which had been seized by his officers within the Hanseatic waters.  Nothing could be more iniquitous than this whole proceeding ; it was a mockery of justice, disguised under the garb of law.  Considering all the circumstances, I was of opinion at the trial,

1817.

SMITH
*v.*
The Delaware
Insurance
Company.

and still strongly incline to the same opinion, that this seizure and condemnation, stript of all false pretences, and reduced to the naked truth, was an act of violence, not falling within the true intent of the warranty. In the *Antwerp* cases, decided in this Court, the pretence was, that the seizure and confiscation were made under decrees of the emperor; and there was the same warranty as in this case. Yet the assured recovered. There, too, the emperor, in person, ordered the property to be sold, without any condemnation by the usual tribunals. No point was brought forward on the warranty; I presume, because it was not thought tenable.

Hitherto, I have considered the case, as if *Hamburg* was within the territory of the emperor *Napoleon*. If it was not, upon the defendants' own argument, the decree would have no validity. It is certain, that *Hamburg* was under the controul of the French arms. The emperor was in a condition to give the law. But, upon reflection, I am inclined to think, that when the cause was tried, I gave more weight to this circumstance than it merited. For, although the emperor had force sufficient to make a conquest, yet it does not appear, that he occupied *Hamburg as an enemy*, or *dissolved the government;* on the contrary, the senate were permitted to exercise their functions, and the American consul was actually residing there. In this situation, when the citizens of the *United States* were trading to *Hamburg*, they had a right to look to the municipal laws of *Hamburg*. A belligerent, who has temporary occupation of a *neutral country*, but does not take the government into his own hands, is not in a condition to make such ordinances respecting commerce, as are contemplated by the plaintiff's warranty. In the case of *Church* v. *Hubbard*, 2 *Cranch*, 187. the seizure was, for breach of an ancient law of the Portuguese government; and in *Faudel* v. *The Phœnix Insurance Company*, (decided in this Court, at *March* Term, 1815,) there was an ordinance of the established Spanish government. But there is a case, much like the present, and full as strong, in which it was decided by the Court of King's Bench, in *England*, that the temporary occupation of a neutral country, without dissolving the government, does not give the occupant a right to make municipal regulations, of which other nations are bound to take notice. I allude to the case of *Donaldson* v. *Thompson*, 1 *Camp-*

bell, 429. The question was, whether a decree of a Court of admiralty, established by the emperor of *Russia*, in 1807, in the island of *Corfu*, (one of the islands of the *Ionian* republic) was of any validity. It was in evidence, that the Russians had, at that time, a garrison in *Corfu*, and 6000 men in the different islands of the republic; that they had made *Corfu* a *military station* for four or five years, and continued in possession of it, till the peace of *Tilsit*, when they delivered it up to the French; but that previously to that event, the flag of the *Ionian* republic was hoisted in the forts in the island; there was a port admiral appointed by the republic, and consuls from the *Sublime Porte* and the king of *Great Britain*, were recognised by the prince and senate of the republic, who continued in their functions, till the government was dissolved by the French. On these facts it was decided, that the Russians were to be considered as *visitors* in *Corfu*, and *not sovereigns;* that they had no right to establish a court of admiralty in a neutral territory, and consequently the decree was void. So far as regards force, the Russians were, at *Corfu*, what *Napoleon* was at *Hamburg;* both had power to dissolve the government of the country, and both, from political motives, declined it. Considering the present case, then, under all its circumstances, I do not perceive that either law or justice require a new trial.

GIBSON J. If the territory, within which the seizure was made, had been actually subject, whether legitimately or not, to the legislative controul of the French emperor, I would, notwithstanding the extreme injustice of the decree as applied to the cargo of this vessel, hold the trade illicit and prohibited, within the true meaning of the warranty. The broad line of distinction lies between *intra-territorial* and *extra-territorial* laws. The first, no matter what the motive may be, arise from an exercise of power, at least lawful; and, within the actual limits of the state, bind every person to obedience, whether subject or foreigner; the second, except insomuch as they are intended to controul, on the high seas, the subjects of the sovereign enacting them, arise from attempts at usurpation; and are, therefore, as against all others than such subjects, of no force whatever. In other words, every sovereign may, within his own territory, bind every one by his laws, whether citizen or stran-

1817.

SMITH
*v.*
The Delaware
Insurance
Company.

ger; but beyond its limits, he can bind none but his own subjects, and even those, only on the ocean, which for that purpose, is considered as a part of his territory. An intra-territorial, or, as it may be more aptly called, a municipal law, whether its object be domestic or belligerent, and what-ever be the injustice of its operation on persons, as in this case, ignorant of its existence, and therefore without the means of avoiding its infraction, is nevertheless obligatory on all. Without doubt ignorance may with propriety be urged to the local authorities as an equitable consideration for re-mitting the penalty where a discretionary power exists; but it cannot be insisted on as giving a *right* to a dispensation; much less can it authorise a *foreign* jurisdiction to question the validity of the law. A municipal law must doubtless be promulgated; but it is not *necessary* that it be so at any de-finite period before it goes into operation; it is sufficient to bind foreigners, that the promulgation is good as to citizens. It is therefore unimportant, that, in this case, the law went into operation before the plaintiffs, residing here, could be in-formed of its existence. Such a law operates only on those *within* the territory of the sovereign declaring it, and does not, like a proclamation of blockade, affect those without. A foreigner must, therefore, be content to take the laws of every country he visits, as he finds them, without scrutinising their justice or policy; nor does it lie in his mouth to say they were enacted for a cover or to entrap; his business is to obey. He is an unbidden guest, and must take such entertainment as chance may afford. The justice of a law, therefore, has no relation to its obligatory force. These principles are, I apprehend, incontrovertible. Then what is the character of so much of the decree as is applicable to the question? It is, I think, beyond doubt, exclusively municipal. There is no assumption of authority, to seize on the ocean; at least, no such authority is asserted in the decree itself; unless it be that implied authority which every sovereign rightfully has to arrest, even beyond his own limits, a vessel on her way to violate his domestic regulations; and which, by the bye, would, if the prohibited goods had, in this case, been ulti-mately destined for any place in the French territory, have superseded the necessity of proof of actual trading, or even an intention to trade, at the place of seizure. The presump-tion, therefore, is, that *Napoleon*, notwithstanding the obli-

quity of his general course in respect to commerce, originally intended to execute this decree within his own territory, rather than that he intended from the first to violate every thing like international law. It will be found, that when he meant to break through all restraint, he was usually pretty explicit, at least in the language of his decrees. But, be that as it may, we must look at the decree itself for its character; for no subsequent abuse of it can change its original nature, and therefore it will be deemed unexceptionable if it bear nothing offensive on its face. In the case of *The Acteon*, 1 *Edward's Adm. Rep.* 255, Sir *William Scott*, speaking of this same decree, admits, that looking to its terms it would seem to be confined to ships navigating *only to the ports of France*, and although he there decreed salvage to the re-captors, it was not because the vessel would have been in danger of condemnation from a fair application of the decree, but because the capricious practice of the French prize courts would, though the vessel was not bound to a French port, have *perverted* it into a colourable pretext for condemnation; and that, therefore, there was, by the original capture, a *violent probability* of eventual loss to the American owner; which was all that was necessary to be made out by the re-captors; for it is not the justice of the condemnation, but the degree of probability, that it would have occurred, which determines the propriety of salvage. This decision admits all that I ask. The decree purports to be confined to property either actually in *France* or going to a French port; and if so, the practice of the French prize courts cannot determine its character to be extra-territorial; for it is no objection to the validity of a law when applied to an object fairly within its operation, that the same law has also been applied to another object *not* within its operation. Within the French territory, therefore, commerce in colonial produce, unaccompanied by a certificate of origin, was lawfully prohibited; and I take the prohibition contemplated by the warranty to be, that which arises from a law exclusively and indisputably municipal, as this was, without regard to whether the motive for its enactment were domestic or belligerent. Nor do I allow more weight to the objection urged against the manner in which the decree was in this

1817.

SMITH
*v.*
The Delaware
Insurance
Company.

instance executed. Every state may execute its own laws in its own way. The executive and judicial departments of the government may be united, or kept separate, at the pleasure of the nation; and when the latter is the case, being for the protection of the subject, the sovereign may, nevertheless, without being answerable to any but the nation, execute the laws in person, or by other instruments than the ordinary courts of the country: it is a matter with which third persons have nothing to do. I speak with reference to municipal laws; for the law of nations not being subject to the will of any individual state, must be executed in the way that law itself requires. Then the condemnation having been by the emperor in person, was at most an irregularity in the procedure, of which, like an error in process, a neutral can take no advantage. It is sufficient that the property was in fact obnoxious to the penalty, and that the rule was avowedly applied to it under the authority of the nation; but whether by the sovereign himself, or by the regularly constituted tribunals of the nation, is only for the nation itself to enquire. The latter, by acquiescing, makes the sovereign the proper organ, if he were not so before. In truth, the act of the sovereign is in all cases the act of the nation, and must be so considered by every foreign jurisdiction.

But the circumstance most important to the plaintiff's case, is, that the place where the seizure took place was no part of the French territory. For take it that *Cuxhaven* was an appendage to *Hamburg*, yet *Hamburg* itself was not, as regards neutrals, subject to the French laws. To give validity to this decree as a municipal law of the place of seizure, it is requisite that such place be part of the French territory. Now there is no doubt but the country was overawed, and treated, really though not ostensibly, as if it had been conquered. But although conquest be a legitimate means of acquiring the sovereignty of a country, whether the war be just or unjust (for that is for the exclusive consideration of those that are parties to it) still it is necessary, on taking possession, to abolish the ancient authorities, or at least supersede those who are found in the exercise of the governmental functions; for while they are suffered to continue, they constitute the actual government to which, only, neutrals

can look. Before the conqueror is recognised as the owner of the sovereignty, he must take exclusive possession of it, and become the ostensible as well as real administrator of the government. The change should be a matter of notoriety to the surrounding states. In the case of the *Bolletta*, 1 *Edward's Adm. Rep.* 178. Sir *William Scott* inclined to think that a territory obtained by force does not change its national character, until the acquisition is confirmed by cession or a long lapse of time. But perhaps it may be admitted, that where the occupancy is not for a temporary purpose, and the government organised by the conqueror is not provisional, but such as indicates a permanent annexation, neither cession nor lapse of time, as to neutrals, is necessary. Strangers are bound, without scrutinising the title, to submit to whatever government they find established: the appearance of a settled state of things is all they ought to require. On this principle the American government has always acted in its diplomatic intercourse, and, I believe, with the approbation of the world. But, on the other hand, it is fully proved by the case of *Donaldson* v. *Thompson*, 1 *Camb.* 429. that the French had not such possession of the country as entitled them to legislate for it. The Russians had more ample possession of *Corfu*, for they occupied it as a military station ; but because the *Ionian* republic continued to entertain foreign consuls, while its flag still flew, and its port admiral performed his usual functions, the Russians were looked on as visitors, not sovereigns; and Lord ELLENBOROUGH took the precise ground that while a government subsists, a court cannot look to the degree in which it may be overawed by a foreign force. In *Levi* v. *Alinutt*, 15 *East*, 267, the same principle, under circumstances very much like the present, was directly recognised. That was an action on a policy on goods from *London* to any place in the *Baltic*, "warranted free from confiscation "by the *government*, in the *ship's port or ports of discharge*." The ship and cargo on arriving at *Pillau*, in the Prussian dominions, was at the same instant seized by a party of Prussian soldiers, and by the crew of a French privateer, who disputed the possession of her ; on which the Prussian government referred the matter to the French government at *Paris*, where the ship was condemned as prize to the

1817.

SMITH
*v.*
The Delaware
Insurance
Company.

French captors. Lord ELLENBOROUGH, with the concurrence of the other judges, said that the conduct of *Prussia* evinced her vassalage to *France*, but could not be deemed an act of confiscation by her; for though it shewed a permission for *France* to do as she pleased in the Prussian ports, yet to hold that to be a Prussian confiscation, would be saying that every country, too weak to protect its independence, confiscated all the property which the French chose to take within its territories. The confiscation being therefore considered *not to be the act of the government of the country*, was held to be no breach of the warranty. There is no doubt the senators of *Hamburg*, like the government of *Prussia*, in the case just cited, were the creatures of *Napoleon;* but although the government was at his feet, it was suffered to exist. The counsel say, he might have introduced his grenadiers into the senate house, and procured from them, in the garb of legislators, a recognition of the decree; and ask if its extension, thus procured, would have given it more validity than it already had? That is an extreme case; but I answer, it, perhaps, might; being considered either as an abolition of the old government, or a personal superseding of the former senators, if the ancient form were still supposed to subsist. It might be sufficient for neutrals, if the law were declared by any persons occupying the places of the former administrators of the government: at all events, they would know what they had to trust to if they entered the country. But so far was the old government from being superseded, that the French had not even *military* possession. A corps of *douaniers* had made a lodgment in the country, and established a line of custom-houses along the *Elbe;* but in every thing else there was no visible change. The senate and burgomasters maintained, apparently at least, the usual commercial relations by accrediting foreign consuls; and in no matter of police did these custom-house officers, who, in truth, were only visitors, interfere. The country was afterwards formally incorporated with *France*, as an integral part of the empire; but that shews it was not so before. Then, as neutrals can receive the law only from such government as may be found in the actual exercise of its functions, whether it exists by force, by fraud, or at sufferance, it follows, the seizure was a wrongful application of the decree to territory not

subject to the French government, and therefore an act of lawless violence. On this last ground, I am against a new trial.

DUNCAN J. gave no opinion, not having heard the argument.