Francis
v.                                              New trial granted.
Ocean Ins. Co.

---

### FRANCIS *against* THE OCEAN INSURANCE COMPANY.

In an action on          ASSUMPSIT for a total loss on a valued policy of insur-
a policy of in-   ance, on the British brig *Francis ;* tried at the adjourned
surance, upon
a British ship,
by an American underwriter, with a warranty against seizure for illicit trade, the defence
was, that she was seized in a British port, and condemned by a court of admiralty there,
for illicit trade ; *held,* that the condemnation was not conclusive against the assured.

A citizen or subject of a country, is not to be deemed a party to a sentence of confisca-
tion in its courts ; and, therefore, concluded by it as his own act.

And so, *it seems,* of a statute, or any other public authoritative act of his government ; as
an embargo.

It seems, that a foreign sentence of condemnation is, *prima facie,* evidence that the caus-
es of condemnation mentioned in it exist, and of the authority of the court to pronounce
sentence ; and throws it upon the party who denies the existence of the causes or the juris-
diction of the court, to do them away by evidence on his part.

So of the regularity of the proceedings.

Any government may lawfully provide for the seizure of vessels, or property belonging
to its own subjects, for a breach of its municipal regulations, either on the high seas, or
within its own territorial limits.   And so of their subjects themselves.

And so, *it seems,* of vessels belonging to foreigners.

Where a seizure and condemnation was, in terms, *for breach of some or one of the Brit-
ish laws relating to trade and navigation ; held,* that the party who would avail himself of
the sentence, must not only shew the proceedings of the court, but the existence of the
law, under which the condemnation took place, by the usual evidence.

The libel and sentence are not evidence of the statute law upon which it is founded.

Proof that a ship's papers were seized with her, and delivered into the court where she
was condemned ; but that a certain paper belonging to her, could not be found there on
search, is sufficient evidence of loss, to warrant parol evidence of its contents.

By a statute of *England,* a certain amount of repairs in a foreign port takes away the
national character of the vessel.   *Held,* that repairs being made to less than that amount,
did not render it necessary to sail with evidence of the true amount of repairs, as part of
the ship's papers.

If it be the duty of the master, or supercargo, in behalf of the assured, to appear, and
put in a claim to a vessel insured, and improperly seized under pretence of carrying on illicit
trade, (of which *quære,*) the omission of this duty may be excused by irregularity in the
court where the suit is pending ; as where process of monition is returnable at one place,
and the cause heard, and the vessel condemned at another, unknown to the supercargo.

The assured, in a policy upon a ship, who sustains a total loss by seizure, &c. is entitled
to recover all expenses fairly incurred in obtaining a restoration of the proceeds of the
ship, on condemnation and sale.

In an action on a policy of insurance upon a ship, it appeared that when the underwri-
ters were applied to for payment for a total loss, they replied that they would not settle
the claim in any way.   *Held,* that this was a waiver of preliminary proof of interest in
the assured.

Answers to interrogatories upon a commission cannot be objected to, at the trial, as in-
competent evidence, provided they are fairly within the scope of the interrogatories.

The proper time to object is, when the interrogatories are settled.

But the answers must be restrained in their effect to matters of fact ; and cannot be re-
ceived to establish a matter of law ; as where a master of a vessel answered that the voy-
age was fair and lawful, &c.   This was held inadmissible, beyond shewing the *bona fides*
with which he acted.

ALBANY,
Oct. 1826.

Francis
v.
Ocean Ins. Co.

*New-York* circuit, *January* 10*th*, 1824, before EDWARDS, C. Judge.

The policy was dated the 15*th* of *November*, 1817, and was at and from *Middletown*, in *Connecticut*, to one or more islands in the *West Indies*, &c. ; and contained the usual risks of the seas, &c. takings at sea, restraints, &c. of all kings, princes or people, with a clause, that in case of any loss or misfortune, it should be lawful and necessary, for the assured to work, labor and travel, for, in and about the safeguard and recovery of the vessel ; to the charges whereof, the defendants would contribute, &c. warranted free from any damage or loss which might arise in consequence of a seizure or detention, *for, or on account of any illicit or prohibited trade*, &c. The policy provided for payment within 30 days after proof of loss.

On the trial, the plaintiff admitted that no preliminary proof of interest in the assured, had been furnished to the defendants. But he showed, that on producing the other preliminary proofs to the defendants, (*August 9th*, 1821,) they answered, that *they would not settle the claim in any way.* It appeared that the ship was owned by the plaintiff, a British subject, on whose account she was insured. She sailed on the voyage insured in *December*, 1816, under the British flag, *Robert Garrick*, a British subject, master. At the time he took charge of her, (*September 21st*, 1816,) the crew were all English, 8 in number. The ship was 147 tons, and had an English register, the last he saw of which, was in *December*, 1817. She had undergone repairs at *Middletown ;* but to an amount less than 15*s.* for each ton. But there was no proof of this among the ship's papers. *Garrick*, the master, was examined for the plaintiff, on commission under the statute, (1 *R. L.* 519, 20,) and answered to the 11th and 12th interrogatories of the plaintiff, that the voyage, as far as he knew, was fair and lawful ; that the vessel was regularly cleared out at *Middletown ;* and he knew nothing of any illicit transactions on the voyage ; and that she was not engaged in any illicit trade while he commanded her, (which was during the voyage,) with any power or pow-

ers. About the 25th of December, 1817, *Thomas Francis*, a British subject, being then supercargo, the ship while standing off and on the port of *St. Johns*, in *Antigua*, to try the market, was seized and taken possession of, with all her papers, by his Britannic majesty's ship *Antelope;* in consequence of which, the voyage was broken up, and the ship and cargo lost to the plaintiff. The vessel being libelled in the court of vice admiralty at *Antigua*, the supercargo intended to make a defence ; but being misinformed as to the time and place of hearing, the attempt failed. He went to the court house ; but was told on his arrival, that the vessel had already been condemned at the judge's chambers.

The answers to the 11th and 12th interrogatories, were objected to as inadmissible ; but the objection was overruled ; and the defendants excepted.

Among the ship's papers was a license to the master, obtained from the British consul at *New-York*, to complete the crew by seamen not British. All the papers having been filed in the vice admiralty ; and no account being given of this paper by tha registrar of that court, who was examined on commission, the plaintiff, (though this was objected to,) was allowed to give parol evidence of its contents.

The libel and sentence of the vice admiralty, were proved by the defendants under a commission. By these it appeared that the ship was captured on the high seas ; that she was libelled, 1. as importing goods, &c. not being a British vessel, and manned with a crew $\frac{3}{4}$ British, against the form of the British statute. 2. As importing goods prohibited by British statute. 3. As having been repaired, when this was not necessary, &c. at *Middletown*, to the amount of more than 15s. per ton, and yet importing, &c. contrary to a British statute. 4. As importing prohibited articles from the United States, contrary to a British statute. The process of monition was to appear on the 21st of *January*, between 9 and 12 A. M. at the *St. Johns* court house. It was served by being fixed on the court house door. Here, as before mentioned, the

supercargo appeared; but the condemnation was at the judge's chambers. The decree recited that no claim had been interposed; and condemned the vessel and cargo as forfeited, "for a breach of some or one of the laws relating to trade and navigation."

Considerable expense was afterwards incurred by the plaintiff, in prosecuting, by his agent the supercargo, a claim before the lords commissioners of the British treasury, *London*, for the proceeds of the ship; by whom an order was made to restore the nett proceeds.

Verdict for the plaintiff, for $8,000, subject to the opinion of the court, &c. on a case, with liberty to either party to turn it into a special verdict or bill of exceptions.

*J. Duer*, for the plaintiff.    1. The preliminary proof was sufficient; the necessity of making proof of interest being waived by the conduct of the defendants.    The refusal to pay was general.    Had they intended to make an objection on the ground of a defect in the preliminary proof, they should have said so.    (*Vos* v. *Robinson*, 9 *John.* 192.)

2. The defendants failed to prove that the vessel was seized and condemned on account of an illicit and prohibited trade.    This was matter of defence.    The warranty was not affirmative; as that a certain course of conduct should be pursued.    In such a case, I agree that compliance must be shewn by the assured. It is a condition precedent.    (*Condy's Marsh.* 346, 7    7 *John.* 47.    2 *Serg. & Rawle*, 119.)    In this case, however, the *onus* lies on the underwriters.    What is the meaning of this clause of warranty?    I agree that the cases in *Massachusetts* would seem to give effect to a sentence founded on a mere pretence of illicit trade; but they are in opposition to the decisions of both our own courts, and those of *England*. These require that the underwriters should show a lawful authority, in fact, to seize and condemn; not merely a seizure and condemnation on the ground of illicit trade; but that the trade was, in fact, prohibited; that an offence was, in truth, committed, which formed a legal foundation

for the forfeiture. (*Johnston* v. *Ludlow*, 2 *John. Cas.* 481. 1 *Caines' Cas. Err.* xxix, *S. C.*) So in the supreme court of the *United States.* (*Church* v. *Hubbart*, 2 *Cranch*, 187. *Condy's Marsh.* 346, *note* (55.) So in *Pennsylvania.* (*Smith* v. *The Del. Ins. Co.* 3 *Serg. & Rawle*, 74, 82.) The seizure in question was made on the ground of a violation of the municipal regulations of *England;* and though, if it had been for a violation of the law of war, the court would not require proof of the authority of a public armed vessel ; yet they will require it in a case which does not rest on the law of nations. They cannot take judicial notice of the local municipal regulations of foreign countries.

But, if this is to be taken as a legal condemnation as between the owner and the British nation, yet it is an event against which we did not warrant. The vessel was seized on the high seas by a public ship. No nation has power to pass a law giving such an authority. The plaintiff's vessel was without the jurisdiction of municipal law ; and subject only to the law of nations. There being a defect in the jurisdiction of the court at *Antigua*, the sentence was inoperative and void. (*Rose* v. *Himely*, 4 *Cranch*, 241, 268.) The only evidence of condemnation on the ground of illicit trade is the record ; and in no case should this be received, even as *prima facie* evidence, without proof that the court had jurisdiction. There is no pretence that the court of vice admiralty acted under the law of nations. The subject was not within its ordinary powers, and this court cannot see that it had jurisdiction. As a court of admiralty, it had no power to enforce a municipal regulation. Its power must depend on some local statute. None is shown. In *Rose* v. *Himely*, it was deemed necessary to shew the authority of the court affirmatively, to punish infractions of the municipal law. It was conceded that it could not do this as a court of admiralty ; but only in the character of an instance court ; and acting in the latter character, upon pretence of a municipal offence which did not exist, the property being seized on the high seas, the condemnation was holden void. The

ALBANY.
Oct. 1826.

Francis
v.
Ocean Ins. Co.

record is proof of what appears on its face, not of jurisdiction. And though there be jurisdiction, if the facts set forth do not warrant a condemnation, the record cannot be received to prove a breach of the warranty. (1 *John. Rep.* 485. 2 *Cranch*, 187. 4 *id.* 241. *Fitzsimmons* v. *The Newport Ins. Co.* 4 *Cranch*, 185. *Doug.* 574. *Condy's Marsh.* 397.) Where it is seen that the foreign court acts properly, nothing more is required, either to show jurisdiction, or the cause of condemnation. But what means have this court of inquiring into, and determining a question arising out of the municipal law of another nation ? In every case in the courts of the *United States,* the propriety and necessity of this inquiry into jurisdiction, and the original law conferring that jurisdiction, has been admitted. (4 *Cranch*, 268. 2 *id.* 189.)

But suppose the court had jurisdiction both of the place and subject matter; still we say this sentence is void for defects apparent on the face of the proceedings.

It is void for uncertainty. It does not appear what law was violated. The cause of condemnation must be substantially shown, or the sentence is not evidence. To say the contrary, would make it conclusive; an effect which all the cases in this state deny to it. If we cannot avail ourselves of the uncertainty, there is nothing which we can deny. No time is mentioned; nor does it appear that the alleged violations had any connexion with the trade in which the vessel was engaged. In truth, no cause of condemnation appears upon the face of the sentence, except the default of the master to interpose a claim. The sentence passed by default. There was no trial. Such a cause is altogether inadequate. The master was not bound to interpose a claim. ( *Gardere* v. *The Col. Ins. Co.* 7 *John.* 514.) Beside, the proceedings are, on their face, fraudulent. The parties to be affected, had neither actual nor constructive notice. I admit, that where proceedings are *in rem*, as in admiralty and revenue cases, personal notice is not necessary ; but the usual course is to proceed by attachment; or at least a monition must go. This is required by the law of nations. (Vid. *Hall's Adm. Pr.*

132, 3.) It does not appear, here, that the parties had, or could have had, any notice. The notice which was given, was calculated and probably intended to mislead. It was to appear and shew cause at the court house, at the very hour when the vessel was condemned at the judge's chambers.

Again; all the causes of condemnation alluded to by the libel, are disproved. They rest on the single fact of importation, which means bringing to some port for the purposes of sale by way of commerce. The vessel had not reached the port when she was seized.

3. In addition to a total loss, the plaintiff is entitled to recover the moneys fairly expended in suing for, and obtaining a restoration of the proceeds of the vessel. (1 *John.* 412. 7 *id.* 57, 412.) We do not seek to recover what was properly chargeable on the cargo.

*G. Griffin* and *D. B. Ogden,* contra. 1. There was no sufficient preliminary proof of interest. We leave it to the court to say, whether the plaintiff has brought himself, on this point, within *Vos* v. *Robinson,* which he relies upon.

2. the answers of *Garrick* to the 11th and 12th interrogatories, should not have been admitted. These answers were general, and went both to the law and the fact. Perjury could not be assigned of them. Aside from these answers, there is no evidence against the fact of illicit trade.

3. Parol evidence ought not to have been admitted of the contents of the paper obtained from the British consul at *New-York.* The registrar should have been interrogated on the subject particularly; or an authenticated copy should have been produced.

4. The assured being a British subject, cannot recover for any act done by, or under the authority of his own state. The sentence was conclusive against the whole world. Here was no want of jurisdiction in the British government, merely because the seizure was on the high seas. A nation may enforce its municipal regulations against its own subjects, either on the high seas or within its jurisdic-

ALBANY,
Oct. 1826.

Francis
v.
Ocean Ins. Co.

tional limits.   The plaintiff was a British subject; the vessel insured was British; both, therefore, subject to British laws; and the vessel, sailing under a British flag, was condemned by a British court, for violating those laws.   A public ship has jurisdiction every where over the subjects and vessels of its own nation, whether out at sea or in the harbor.   There is no case limiting this authority, except as to other nations; and even as to these, it may extend beyond their immediate jurisdiction. (2 *Cranch*, 234.)  The court having jurisdiction, the plaintiff cannot question its proceedings.   He was a British subject, and a party to those proceedings.   They are to be deemed his own act.   This has repeatedly been holden of the legislative acts, and public ordinances of a government.   (*Conway* v. *Gray*, 10 *East*, 536.   *Same* v. *Forbes, id.* 539.   *Murray* v. *Shedden, id.* 540.   *Touteng* v. *Hubbard*, 3 *B. & P.* 291, 302.)   He is equally a party to the judicial acts of his own government.   (*Mennett* v. *Bonham*, 15 *East*, 477.   *Flindt* v. *Scott, id.* 525.   *Simeon* v. *Bazett*, 2 *M. & S.* 94.   *Bazett* v. *Meyer*, 5 *Taunt.* 824.   *Flindt* v. *Scott, id.* 674.   *Power* v. *Whitmore*, 4 *M. & S.* 141.) A condemnation by one of the assured's own tribunals, is like the interruption of a voyage by his own act.   It is a general rule that the act of a government is the act of each individual of that government; (7 *John.* 308, 9;) except where both parties litigant are subjects of the government which does the act.   (*id.* 318.)   There, the rule, which is a political one relating to foreign governments, does not apply.

5. There is no evidence, that the vessel had not, in fact, been guilty of the infractions of the British laws relative to trade and navigation, charged in the libel.   There can be no doubt that the sentence is *prima facie* evidence of the facts contained in the record.   (2 *John. Cas.* 457, 467.   2 *Cain. Cas. Err.* 217.)   These are negatived, we have seen, by nothing but the oath of the captain.   But in this case, the sentence is more than *prima facie* evidence. It is conclusive upon the plaintiff, because he was a British subject.   The decisions cited, holding these sentences

ALBANY,
Oct. 1826.

Francis
v.
Ocean Ins. Co.

to be only *prima facie* evidence, do not apply to a con&shy;demnation against one who is a subject of the state which condemns. They were founded on the danger of improp&shy;er influence over foreign tribunals.

Again; it is not a compliance with the warranty, that the trade was not illegal: it is equally violated, if the ves&shy;sel be not navigated according to law, having all necessa&shy;ry papers to maintain its character. (*Cleveland* v. *The Un. Ins. Co.* 8 *Mass. Rep.* 308, 320. *Oswell* v. *Vigne*, 15 *East*, 70.) The warranty extends to the particular ad&shy;venture. (*Duguet* v. *Rhinelander*, 1 *John. Cas.* 360. *Miller on Ins.* 496.)

The sentence is certain enough. In law, that is cer&shy;tain which may be made so. Take the sentence in con&shy;nexion with the libel; and there is sufficient cause of con&shy;demnation apparent. How far from *Antigua* the vessel was when seized, does not appear. If she was in the lim&shy;its of the port, this amounted to an importation. (*Leaper* v. *Smith*, *Bunb.* 79. 1 *Chit. Com. Law*, 244, 246.) But we will not insist that here was an importation in fact. It is enough that the condemnation assigns this for cause. It is conclusive upon the plaintiff, who was a party to the proceeding.

6. There was a breach of the implied warranty, that the vessel should be navigated and documented as a Brit&shy;ish vessel. Being described as a British ship in the poli&shy;cy, this amounts to a warranty of her character; and she was bound to sail, and be furnished as such in all respects, so as to maintain her character. (*Goix* v. *Low*, 1 *John. Cas.* 341. *Murray* v. *The U. Ins. Co.* 2 *id.* 168. *Barker* v. *The Phœnix Ins. Co.* 8 *John.* 307. *Blagg* v. *The New-York Ins. Co.* 1 *Caines' Rep.* 549.) Three fourths of the seamen should have been British. The excuse for having a less number was not properly certified. (1 *Chit. Com. Law*, 256, 7.) Nor had the vessel any papers shew&shy;ing her repairs to be less than 15*s.* on each ton. Here are two warranties; one express, the other implied; and if they be not both complied with, the underwriters are not accountable for the loss, let it happen from what cause

it would.    (*Phil. on Ins.* 127, *and the cases there cited.*
*Park*, 287.)

We have a right now to show what are the British nav-
igation laws; and may use *Chitty's* commercial law as ev-
idence.    (3 *John.* 107.)

[The counsel also cited different parts of *Holt's Law
of Shipping*, to show that the British navigation laws had
been violated by the vessel in question.]

7. No answer or claim was put in, or defence made to
the libel. The master was bound to defend. All being
British, and no successful defence being made, we are
bound to infer that none could have been made, through
some defect in the papers. Here being no immediate
right to abandon, the master was the agent of the assured
only. He continued so till after the condemnation. The
claim might have been interposed before the monition was
returnable. It is very usual in courts of admiralty to dis-
regard the place of return, where no claim is interposed;
and though the process mention one place, to condemn at
another, where the judge happens to be at the time. They
do this because no opposition appears. No fraud is, there-
fore, imputable on that ground. It is a common thing
with our own courts of admiralty.

*T. A. Emmet*, in reply. The lords commissioners re-
stored the proceeds of the vessel. This appears by the
preliminary proof; and established the national charac-
ter of the vessel and the interest of the assured, for the
purpose of preliminary proof. But it is evident the de-
fendants did not mean to question the plaintiff's interest,
by the general ground which they took on the demand of
payment.

As to the answers of capt *Garrick;* illicit trade is what
every navigator is bound to know. It was right, there-
fore, for him to answer generally; and if gentlemen desi-
red him to be more particular, they should have cross ex-
amined him. This is every day's practice, where the
question relates to one's ordinary and daily occupations,

mixed up of law and fact. If the answers were false, they were a fair subject of indictment for perjury.

But the objection came too late. It should have been made to the interrogatories when they were settled by the judge.

The loss of the paper received from the British consul, was sufficiently shown to warrant the parol evidence. All the papers went into the court of vice admiralty ; and it was the duty of the registrar when examined on commission, to annex it to the interrogatories, if it continued with him. Not having done so, the presumption is, that it was not to be found.

As to jurisdiction ; the record speaks of the high seas as the place of seizure ; and the evidence is inconsistent with the case being within the jurisdiction of a municipal court.

I yet want to see the law which says, that the sentence of a court is more conclusive on the subject of the country to which the court belongs, than a foreigner. Whatever a sentence *in rem* may be, it is the same as against all the world. Its effect is not tried by the parties. If conclusive against one, it must be so as to all. But suppose this to be its effect ; upon what is the sentence before the court conclusive? The libel states four different causes of condemnation ; all under the navigation laws. The sentence does not establish all or either of them. I admit, that if this had referred to the libel, it would give certainty; but it does not.

If every citizen is to be deemed a party to the acts of his own government, it does not follow that he is a party to the proceedings of all its courts. The cases cited against the plaintiff on this head, do not go beyond laws and public acts of the government itself ; and, in this respect, it will be found on examining them, that they are by no means uniform ; and the higher and better authority in *England,* is now against the doctrine even to this extent.

A judgment by default may carry the consequences of a condemnation ; but it establishes no fact. (13 *John.* 205.) No monition was served, except by affixing on the door of

the court house. There was nothing done on board the ship to bring the notice home to the master or supercargo.

Illicit trade is municipal trade ; and it is not enough that there has been a condemnation for that cause ; but it must be shown that there was in fact an illicit trade.   The law by which the trade was prohibited, must be proved as a fact before the jury.   (*My argument in Smith v. Elder*, 3 *John Rep.* 109.)   A foreign law is traversable ; and must always be proved, just like any other fact.

We were not bound to carry about the ship, proof as to the amount of repairs.  Originally, she was a *British* ship. *Prima facie*, she was to be deemed so in all courts, she having her register about her ; and it lay with the opposite party to justify the seizure, by proving that the amount of repairs had taken away her national character. (*Abbott, pt.* 1, *ch.* 2.)

There is no decision that you may not abandon immediately, on a seizure under pretence of a violation of municipal laws.

*Curia, per* SUTHERLAND, J.   The defendants waived whatever imperfection there may have been in the preliminary proofs of the plaintiff's interest in the subject insured, by not putting their refusal to pay upon that ground.   They declared, " that they would not settle the claim in any way ;" putting their objection to pay on the merits of the case, and not on any defect in the proof of the plaintiff's interest.   If that ground had been taken, the defect might, and undoubtedly would have been supplied. (9 *John.* 192.   7 *John.* 315.   8 *John.* 307.)

But this point was not much insisted upon by the defendant's counsel ; and is clearly incapable of being supported.

It is objected, 2. That the answers of capt. *Garrick*, to the 11th and 12th interrogatories, ought not to have been admitted in evidence.   The interrogatories do not form a part of the case ; but it must be assumed that the answers are responsive to them ; not going essentially beyond the scope of the enquiries made.   If so, it appears to me the

objection comes too late. It should have been made to the interrogatories. They are settled by a judge, or other officer possessing the powers of a judge, upon due notice, after a copy has been served upon the opposite party. If improper, they may be excepted to, and the exception will either be sustained or overruled by the judge ; and the interrogatories modified or established accordingly. (1 *Dunl. Pr.* 546.) If no objection is made to the interrogatories, the information sought by them is admitted to be proper, and the answers must be considered as *competent* evidence by the admissions of the parties.

Even in oral examinations at *nisi prius*, if a party will permit questions to be put to a witness without objection, and take his chance for a favorable answer ; when that answer is given, and proves adverse to his wishes, it is too late for him to object that the question ought not to have been put.

But although the answers are not to be struck out of the case as incompetent evidence, they are to be restrained in their effect to matters of fact, and not to settle questions of law. When the witness says that the voyage, as far as his knowledge went, was a fair and lawful voyage ; that the vessel was regularly cleared out from *Middletown ;* and he knew nothing of any illicit transactions on the voyage ; and that she was not engaged in any illicit trade while he commanded her ; he must be understood as speaking merely to the *bona fides* of the object of the voyage, and the conduct of the master ; and not as determining, or attempting to determine, whether the transactions which are proved to have taken place, did, in judgment of law, amount to an illicit trade, or an attempt to carry on an illicit or prohibited trade, or not.

It is objected, in the 3d place, that parol evidence ought not to have been admitted of the contents of the paper obtained from the British consul at *New-York*, allowing the master to complete his crew from foreign seamen, a sufficient number of British not being obtainable. This objection is unfounded. The paper is shown, by the testimony of *Charles Francis*, to have been delivered to his

brother *Thomas*, the supercargo of the vessel, (who died in 1821,) immediately before she sailed. He further testifies that the vessel sailed with it ; and that it was taken possession of by the captors. The affidavit of *Sayre*, the seizing officer, shows that all the papers taken from the vessel were delivered to the court of vice admiralty at *Antigua* ; and the sworn certificate of *Wm. Ramsay*, the registrar of that court, shows that he has returned certified copies of the papers and proceedings in that court. The paper in question not being among them, the presumption is, that it is not in the office at *Antigua*. This is sufficient evidence of its loss, to admit parol proof of its contents.

These, however, are very subordinate points. Having disposed of them, we now proceed to the consideration of the important questions presented by the case. And, 1. It is contended that the assured, being a British subject, and his vessel having been condemned by a British court, cannot recover for an act done by or under the authority of his own state. There is a class of English cases, which hold this doctrine in relation to the legislative acts of a government; but no case has been furnished by the counsel, and none has been found by the court, in which the principle has been extended to the decisions of courts of justice.

In *Touteng and another* v. *Hubbard*, (3 *B. & P.* 291,) the plaintiffs, being Swedes, and owners of a Swedish vessel, in *December*, 1800, agreed with the defendant, a British merchant, that the vessel should, with all convenient speed, sail and proceed to the island of *St. Michaels* ; and there receive from the agents of the defendant a cargo of fruit in boxes, return with the same to the port of *London*, and there deliver her cargo, at a stipulated price per box. After the vessel had proceeded from *London* to *Ramsgate* harbor, and before she could be got to sea, to wit, on the 15*th* of *January*, 1801, an embargo was laid by the British government upon all Swedish vessels ; by which she was detained in port until the 19*th* of *June* following, when the season for shipping fruit at *St. Michaels*

was over. The defendant gave notice to the plaintiffs that they need not then proceed on the voyage, as no cargo would be furnished at *St. Michaels.* The action was to recover damages from the defendant, for not employing the vessel according to his agreement. And it was held by the court that the action could not be sustained. Lord *Alvanley,* in delivering the opinion of the court, says, the ground on which the court decide this case is, that a British merchant is not liable to answer for any damages, which the owner of a foreign vessel may sustain, from an embargo laid by the British government on foreign ships, *in the nature of reprisals and partial hostility.* He concedes that a common embargo does not put an end to any contract between the parties, but is to be considered as a temporary suspension of the contract only ; and admits the principle of the case of *Hadley* v. *Clarke,* (8 *T. R.* 259,) that a general embargo is a circumstance against which it is equally competent for the parties to provide, as against the dangers of the seas ; and if they do not provide for it, they must abide by the consequences of their contract. But he takes a distinction between an embargo imposed for general purposes, and an embargo directed against the vessels of a particular nation, in the nature of partial hostilities ; and he says, this embargo not only partook of the nature of hostility, but it was in the nature of hostility by the government of *Great Britain,* of which the defendant is a subject, where the charter party was entered into, and in the courts of which the Swedish captain now seeks compensation. And he held that it would be defeating the object of the government, which was a species of reprisal on *Sweden,* to compel a British subject to indemnify a Swede against the acts of the British government, intended to resist the injustice of the Swedish court ; and would be enabling a foreigner to defeat all the effects of the British embargo, and throw the burthen upon a British subject. In the conclusion of his opinion, he says all the cases admit, that where a party has been disabled from performing his contract by his own default, it is not competent for him to allege the circumstances by which he

was prevented, as an excuse for his omission ; and he asks, may not the loss which the present plaintiffs have sustained, be considered in a *political* point of view, as arising from their own default ? Must not every subject of the Swedish state be answerable for what we must consider as an act of aggression on the part of his sovereign ? Here the voyage has been defeated by an act of the British state, to which all his majesty's subjects are parties, occasioned by an act of the Swedish court, to which all the subjects of *Sweden* are parties.

In *Conway* v. *Gray*, and several other cases substantially like it, ( 10 *East*, 536 to 549,) the question came before the court of king's bench, how far the citizens of a country are to be considered as participating in, and assenting to the acts of their government, where those acts are brought to bear upon individual contracts. They were cases arising under our embargo law of the 22d of *December*, 1807. *Conway* and *Davidson*, the plaintiffs, in the principal case, were the consignees of *J. Townsend*, a merchant in *New-York*, who, on the 23d of *December*, 1807, shipped on board a vessel a quantity of wheat and peas, consigned to *Conway* and *Davidson*, at *Liverpool*. The embargo was first known in *New-York*, on the 25th of *December*, before the vessel sailed, by which the voyage was, of course, broken up. The plaintiffs having been advised by *Townsend* of the intended shipment, on the 25th of *January*, 1808, effected an insurance upon it, with the defendant ; and charged the premium to the account of *Townsend*. As soon as the plaintiffs heard of the detention, they abandoned to the underwriters ; and brought their action : and the principal question was, whether the American embargo would warrant an abandonment by, or on behalf of an American subject, against an English underwriter. The court of king's bench held, that the plaintiffs could not recover ; and lord *Ellenborough*, in delivering the opinion of the court, remarks, that " in all questions arising between the subjects of different states, each is a party to the *public authoritative acts of his own government ;* and on that account, a foreign subject is as

much incapacitated from making the consequences of an act of his own state, the foundation of a claim to indemnity upon a British subject, in a British court of justice, as he would be, if such act had been done immediately and individually by such foreign subject himself. In these cases," he continues, " the foundation of the abandonment is an act of the American government. Every American subject is to be considered as a party to that act. It has virtually the concurrence and consent of all ; amongst the rest, the concurrence and consent of the assured in these cases. They have, therefore, joined in a resolution, that the ship in question shall not be allowed to sail ; but shall remain in their port : and is it possible for them afterwards, to make their not sailing, the foundation of an action? The party who, himself, prevents the act from being done, has no right to call upon the underwriters to indemnify him against the loss he may sustain from such act not being done."

This doctrine was reiterated in a series of cases which arose in 1812, under the system then pursued by the British government, of granting licences to trade with the continental powers, with most of whom they were at war.

In *Mennett and another* v. *Bonham*, (15 *East*, 477,) and *Flindt* v. *Scott*, (15 *East*, 525,) the licences were granted to British merchants, on behalf of *themselves and others*. The real parties for whose benefit they were obtained, were Russian subjects, and alien enemies residing in Russia. The goods were insured in *England*. They were seized and condemned in a Russian port, by the Russian government ; and it was held that *the Russian assured*, notwithstanding the license, could not recover from a *British* underwriter, a loss occasioned by the act of his own government ; on the ground that, in judgment of law, he was a party to that act. The latter case of *Flindt* v. *Scott*, was subsequently reversed in the exchequer chamber ; (5 *Taunt*. 674 ;) and though the doctrine which we are now considering was not formally overturned, it was spoken of by the only baron who delivered an opinion, (baron *Thomson*,) in terms, which show that he did

ALBANY,
Oct. 1826.

Francis
v.
Ocean Ins. Co.

not consider it as settled ; and that it by no means received his approbation. He says, " the second objection made to the plaintiff's recovering in this case, was, that the underwriters were not answerable for this loss, because it was occasioned by the act of the *Russian* government, to which the persons interested must be supposed to have given their assent, being *Russians ;* and in support of that position," he continues, " two cases were cited, *Touteng* v. *Hubbard,* and *Conway* v. *Gray.*" And after stating the circumstances of the first case, and that the question which it presented was, whether the *Swedish* owner acquired a right by proceeding on the voyage after the embargo was taken off, to recover the freight against a *British* merchant, he says, " the court determined that he had no such right ; *and they went farther ; and determined, what was not then a question before them, that an insurance, upon the property of a foreigner, against a loss remotely occasioned by an act of his own state, would be illegal.* It was not the main question in that case, though certainly it was so decided. The case of *Conway* v. *Gray,* proceeded, in a degree, on the authority of *Touteng* v. *Hubbard.* But these decisions," he remarks, " *even supposing them to be correct,* as applied to the cases in which they were made, do not affect the present case." No doubt can be entertained from these expressions, that the ch. baron meant to be understood as questioning the correctness of those decisions ; and that if they had stood in the way of a reversal of the judgment then under consideration, they would have been overturned. He adverts with approbation, to the more liberal doctrine held by lord *Ellenborough* in *Usparicha* v. *Noble,* (13 *East,* 332.)

Lord *Ellenborough,* himself, in the more recent case of *Simeon* v. *Bazett,* (2 *M. & S.* 94,) seems to have been anxious to get around, without directly subverting his previous decisions upon this point. That was the case of an insurance effected in *London,* upon the ship *Sophia,* at and from *London* to any port or ports in the *Baltic* or gulph of *Finland,* &c. The insurance was made

by the order, and on the account and risk of certain *Prus-sian subjects*, resident at *Colberg*, in *Prussia*, who were avowed to be the parties in interest.    The ship sailed from *London* to *Colberg*, carrying simulated papers, as was the custom of the trade ; and bearing the Swedish flag. The ship and cargo having arrived near *Colberg*, were seized by certain persons exercising the powers of government in *Prussia*, and were finally confiscated by order of the Prussian government.    *Prussia* had, at that time, acceded to the continental system of the emperor of *France ;* but was at peace with *England*.    One would think that no case could well have been presented, which would call more loudly upon a British court, for the application of the doctrine, that every citizen or subject must be considered a party to the authoritative acts of his government ; and that the Prussian assured, residing in the very place where the seizure and confiscation were made, would not have been permitted to *make his own wrongful act*, if the act of his government be his, the foundation of a claim against a *British underwriter* in a *British court*.    But lord *Ellenborough* held that he was entitled to recover, on the ground that, from the well known course of the *Baltic* trade, (all direct intercourse between those ports and *Great Britain* being prohibited,) the peril in question must have been within the contemplation and meaning of the parties.    And he thus qualifies the doctrine of the previous cases : "The exclusion of risk occasioned by the act of the assured's own government, is only an implied exclusion from the reason and fitness of the thing ; which, however, may be rebutted by circumstances.    As the perils occasioned by the act of the party's own government, are held to be excluded on the reason of the thing ; so they may be held to be included whenever the reason of the thing requires it."    If I understand this gloss, it is neither more nor less than that there is no settled rule of law upon this subject ; but that each case must be decided according to the view which the court may take of its intrinsic equities.    In determining the equity of such a law, I presume his lordship would

have given no weight to the circumstance, that the assured, when the act of his government which is complained of took place, was in another hemisphere ; or if at home, that he solemnly protested against it. This case also came before the exchequer chamber, upon a writ of error, (5 *Taunt.* 824.) The judgment was affirmed on the broad ground, that it was no objection to the plaintiff's recovery, that the loss happened by the act of the country of the assured. And chief baron *Thomson*, who again delivered the opinion of the court, pointedly disclaims being governed by the distinctions taken by lord *Ellenborough ;* and explodes the whole doctrine in this emphatic manner : " This was precisely one of the points disposed of in the case of *Flindt* v. *Scott ;* that the loss was by the act of the country of the assured. I very imperfectly expressed myself in that judgment, if I did not express that which the whole court certainly decided, unless I misunderstood them, *that it was no objection to the plaintiff's recovery, that the loss happened by the act of the country of the assured.* It was argued on, and the court certainly took it into their consideration, and we cannot hear it argued again now. It may have happened, that the court of king's bench have given judgment below for the plaintiff in this action, on a different ground ; but the facts support the judgment upon our reasons."

The contract of insurnce is peculiarly one of equity and good faith ; and I should regret to see it subjected to so technical and fanciful a rule of construction as that which we have been considering. All the cases admit, that detention by an embargo, or other act of any other government than that of the assured, is one of the perils covered by the ordinary policy, and is good ground of abandonment. That an embargo by the government of the assured is as much within the actual contemplation of the parties, as an embargo by any other government, cannot be questioned ; nor that the citizens of a country have no actual participation in the acts of the government, in any sense which would make it a violation of good faith to permit them to make those acts the foundation of a claim

ALBANY,
Oct. 1826.

Francis
v.
Ocean Ins. Co.

against a foreign underwriter.   It strikes me as unworthy of the advanced intelligence of the age, and of the enlightened condition of its jurisprudence, to suffer the symmetry of so important a department of the commercial law, to be broken in upon, on the strength of a notion so purely theoretical.   This is the first time, I believe, in which this question has come before an American court ; and I have, for that reason, dwelt upon it longer than was necessary, for the purposes of the case which we are now deciding.

But, admitting the doctrine of lord *Ellenborough* to be sound, I am not aware that it has ever before been contended, even in argument, that every citizen of a country is a party to all the judgments pronounced by its courts.   The principle has never been attempted to be extended to any other than legislative acts, or acts of state ; such as embargoes or confiscation founded upon state ordinances.

The assured, therefore, is not so far a party to the proceedings of the court at *Antigua*, as to preclude him from making those proceedings, if unauthorized and illegal, the foundation of a recovery against the defendant.

I do not deem it material to determine, whether it is incumbent on the plaintiff, in the first instance, to impeach the judgment and proceedings of the court at *Antigua ;* or whether the burthen of sustaining them is imposed upon the defendants.   The evidence on both sides is before the court.   I apprehend, however, that the sentence of condemnation, with the accompanying proceedings, so far as they disclose the causes of condemnation, are *prima facie* evidence of the existence of those causes, as well as of the authority of the court to pronounce the sentence ; and impose the *onus* of impeaching, either the jurisdiction of the court, or the regularity of its proceedings, or the existence of the facts upon the assumption of which the decree has been pronounced upon the opposite party.

In *Church* v. *Hubbart*, (2 *Cranch*, 187,) the policy contained a condition similar to the one in this case, that the insurers were not to be liable for seizure by the Portuguese for *illicit trade*.   The vessel was seized and condemned by the governor of *Para*, professing to exercise the pow-

ALBANY,
Oct. 1826.

Francis
v.
Ocean Ins. Co.

ers of a court of admiralty, for an attempt to carry on an illicit trade with that port; that is, for a violation of its municipal laws. The defendant there produced the decree, as evidence that the condemnation was for the cause excepted from the policy. The objection was, that the decree was not properly authenticated; and that objection was sustained by the court. But it was not denied that the decree, if properly proved, would have been evidence of the grounds of condemnation, so far as they appeared on the face of the decree. The sentences of foreign admiralty courts have always been received in our courts as *prima facie* evidence against the assured. (2 *John. Cas.* 287, 481-5.)

But the condemnation, in this case, is impeached by the plaintiff, on several grounds: and

1. It is contended that it appears from the libel, that the seizure was made *upon the high seas ;* not as prize of war; but for a violation of the municipal laws of *Great Britain ;* and that the right to seize for a violation of those laws, is confined to the territorial dominions of the government making it. This opinion was expressed by Ch. J. *Marshall ;* and, as he supposed, it was concurred in by a majority of the court, in *Rose* v. *Himely*, (4 *Cranch*, 279.) But the contrary doctrine was finally established by the supreme court of the *U. States*, in *Hudson* v. *Guestier*, (6 *Cranch*, 283.) The seizure was there made for a violation of a municipal regulation in relation to the island of *St. Domingo*, at the distance of six leagues from the island; and confessedly, of course, beyond its territorial limits or jurisdiction. The only question in the case was, whether the seizure was warranted by the law of nations; and the whole court, (with the exception of the Ch. J.) held that it was, and overruled the case of *Rose* v. *Himely*, so far as it conflicted with that opinion. The same doctrine had been previously advanced by that court, in *Church* v. *Hubbart*, (2 *Cranch*, 234, 5, 6,) where the seizure was made five leagues from land. These authorities dispose of this objection.

ALBANY,
Oct. 1826.

Francis
v.
Ocean Ins. Co.

But admitting the general rule to be as contended by the counsel for the plaintiff; that a seizure either of persons or property. for a breach of a municipal regulation, cannot be made beyond the territorial limits of the government making it ; it applies only to persons, not citizens or subjects, and property not belonging to citizens or subjects of that government. That it is competent for the sovereign authority of a country to authorize the seizure of its citizens, or of their property, for a violation of its laws, wherever they can be found, provided the jurisdiction of other nations is not interfered with, is a proposition too clear to require support or illustration. The high seas are the common property of all nations, where each has concurrent, and none exclusive jurisdiction. The sovereign authority of any country, therefore, may arrest its own subjects, or seize their property upon the high seas, without infringing the jurisdiction, or interfering with the rights of any other country. The seizure in this case was of a British vessel, sailing under a British flag, belonging to a British subject, for a violation of British municipal regulations or navigation laws.

Upon either of these grounds, this objection cannot be sustained.

But it is contended, secondly, that admitting the legality of the seizure, there is no sufficient evidence that the vessel had been engaged *in an illicit trade ;* that the court, in making the condemnation, did not act in the capacity of a court of admiralty under the law of nations ; nor was the condemnation for any violation of that law ; but for a breach of the statute law of *Great Britain ;* "of some or one of the laws relating to trade and navigation," as it is expressed in the decree of the court. That it was incumbent on the defendant, therefore, in order to sustain the decree, to prove the existence of a law condemning the trade. This objection, as far as it goes, appears to me unanswerable. The warranty in the policy, against any "damage, charge or loss which may arise in consequence of a seizure or detention for, or on account of any illicit or prohibited trade," extends only to that risk to which

ALBANY,
Oct. 1826.

Francis
v.
Ocean Ins. Co.

such trade is by law exposed. To constitute a breach of such warranty, *the seizure must be for an actual, illicit and prohibited trade.* A seizure and condemnation under pretext of such trade, is not sufficient, if the trade is not *in fact illicit.* Both a seizure and illicit trade must concur ; and the illicit character of the trade is not proved merely by the fact of the seizure. (*Johnson* v. *Ludlow,* 1 *Caines' Cas. Err. xxix. Graham* v. *The Penns. Ins. Co.* 1 *Marsh.* 347, *note.*)

In *Smith* v. *The Del. Ins. Co.* (3 *Serg. & Rawle,* 74,) the action was upon a policy containing a warranty or exception similar to this. The vessel was seized and condemned, for a cause, as it was contended by the defendants, within the warranty or exception. Ch. J. *Tilghman,* (p. 82,) remarks, " to bring the case within the warranty, there must be both a seizure and an illicit or prohibited trade. It is not enough that a seizure is made on an allegation of prohibited trade. *It must be proved that there was a prohibition, and that the case is within it.* So in *Church* v. *Hubbart,* (2 *Cranch,* 236,) Ch. J. *Marshall,* in speaking of this warranty, says, " that the exclusion from the insurance, of the risk of illicit trade, is an exclusion only of that risk to which such trade is *by law exposed,* will be readily conceded. It is unquestionably limited and restrained by the terms *illicit trade.* No seizure not justifiable under the laws and regulations established by the crown of *Portugal,* for the restriction of foreign commerce, with its dependencies, can come within this part of the contract. And every seizure which is justifiable by those laws and regulations, must be deemed within it." In *Smith* v. *The Del. Ins. Co.* the condemnation was alleged to have been for a breach of the 3d and 4th articles of a decree of the emperor *Napoleon,* of the 6*th* of *August,* 1807. Those articles were accordingly read upon the trial, on the part of the defendants. Whether they were read by consent, without proof, or how they were proved, does not appear ; nor is it material. The material fact is, that it was deemed necessary to produce upon the trial, the law under which the

condemnation was made; that the court might judge whether it authorized the condemnation or not; and they held that it did not. In the case of *Church v. Hubbart,* the same course was pursued. The case states, "that the *defendant, to prove that the trade was illicit, offered a copy of a law of Portugal,* entitled, &c.; and to prove that the vessel *was seized for illicit trade,* the defendant produced a paper purporting to be a copy of the sentence of the governor of *Para,* on the brig *Aurora.*" Ch. J. *Marshall* thus states this part of that case: "To prove that the *Aurora* and her cargo were sequestered at *Para,* in conformity with the laws of *Portugal,* two edicts and the judgment of sequestration have been produced *by the defendant in the circuit court.*" And the judgment in that case was reversed solely on the ground, that those *edicts and that judgment* were not properly proved.

These cases seem fully to establish, 1. That to show any particular trade to be *illicit,* under municipal regulation, the law by which it is prohibited must be produced and proved; and 2. That it is the business of the defendant to sustain the sentence by proving the law.

In the case at bar, there was no attempt to prove any law of *Great Britain* prohibiting the trade in which the ship *Francis* was engaged when seized at *Antigua.* So far, therefore, as the sentence of condemnation proceeds on the ground of *illicit trade,* it must be deemed to have been unauthorized and illegal.

The decree itself does not specify the grounds on which the condemnation is pronounced. It merely alleges, that "it is for a breach of some, or one of the laws of navigation."

The libel states four grounds on which the seizure was made: 1. For importing goods, &c. on board the vessel, she not being wholly owned by a subject of Great Britain, and navigated by a British master and $\frac{3}{4}$ British mariners. 2. For importing into *Antigua* certain prohibited goods, &c. of the growth, production and manufacture of *Europe,* &c. 3. That the ship had undergone repairs in the U. S., not necessary, by reason of extraordinary damage, &c.

exceeding 15s. for every ton ; whereby she became an alien vessel ; and being such alien vessel, imported the goods, &c. being prohibited, &c. 4. That certain enumerated articles particularly named, were imported in the vessel by way of merchandizes, from one of the ports of the *U. S. of America,* against the form of the statute, &c.

Upon which of these causes the condemnation proceeded, it is impossible to determine. If but one cause had been alleged in the libel, the decree might be supposed to have intended to adopt and verify that. The causes assigned are, however, not only various, but inconsistent. The remark is alike applicable to them all, that they make the cause of seizure a violation of some British statute ; and the fact of condemnation is the only evidence, not only of the breach, *but of the existence of such statutes.* Ch. Justice *Marshall,* in *Church* v. *Hubbart,* (2 *Cranch,* 236,) in discussing this subject, remarks, that foreign laws are well understood to be facts, which must, like other facts, be proved to exist, before they can be received in a court of justice. The principle, that the best testimony shall be required which the nature of the thing admits of ; or, in other words, that no testimony shall be received which presupposes better testimony attainable by the party who offers it, applies to foreign laws, as it does to all other facts. The sanction of an oath is required for their establishment, unless they can be verified by some other such high authority, that the law respects it not less than the oath of an individual. In *Robinson* v. *Clifford,* (2 *Marsh.* 706 *a. note,*) it is said, " The statute or written law of foreign countries, should be proved by the law itself. The unwritten law may be proved by witnesses." (*Seton* v. *The Del. Ins. Co.* 2 *Marsh.* 706 *a. note.* 2 *Caines' Rep.* 155, 163. *Delafield* v. *Hand,* 3 *John.* 310. 2 *Marsh.* 713. *Smith* v. *Elder,* 3 *John.* 105. 1 *P. Wms.* 431. *Peak. N. P. Cas.* 18. 3 *Esp. Rep.* 58. 4 *id.* 79.) This evidence is addressed to the jury ; and should be given upon the trial, and not at bar.

But it is said that the description of the vessel in the policy, as the British brig, &c. is an implied warranty that

she was a British vessel, and should carry with her the documents necessary to establish that character ; and that if the warranty is false, the plaintiff cannot recover, whether that was the cause of condemnation or not.

Admitting that a description which, in time of war, will amount to a warranty of the *national* character of a vessel, will in time of peace amount to a warranty of her commercial character, (which may admit of very serious discussion,) it is a sufficient answer, that the evidence in the case, clearly establishes a compliance with this implied warranty. The testimony of *Charles Francis* shows that the vessel, at the time of her sailing, had on board a certificate or document from the British consul at *New-York*, dispensing with the usual proportion of British seamen. This document undoubtedly went into the possession of the captors, with the register and other papers belonging to the ship ; and removes all objection to the character of the vessel, growing out of her deficiency in British seamen.

The evidence in the case also shows that the repairs put upon the hull of the vessel at *Middletown*, cost less than 15s. for each ton.

It cannot be necessary for the master of a vessel to carry with him the evidence of the amount expended upon his vessel. If the fact be, that the repairs cost less than 15s. per ton, he has a right to rely upon the knowledge of that fact, and to presume her national character will not be impeached, without some evidence that she has violated the navigation laws in that respect.

Admitting it to have been the duty of the supercargo to have appeared and interposed a claim to the vessel, his omission to do it is sufficiently accounted for. It is shown to have been owing to the irregular proceedings of the court, and not to any culpable omission on his part. He attended at the time and place appointed for trial ; and was informed that the vessel had already been condemned at the judge's chambers. (7 *John.* 426, 514.)

I am, therefore, of opinion that the plaintiff is entitled to recover as for a total loss. The cases of *Watson* v. *The Mar. Ins. Co.*, (7 *John.* 57,) *Maggrath* v. *Church*,

(1 *Caines*, 215,) *Jumel* v. *Mar. Ins. Co.*, (7 *John.* 425,) and *M'Bride* v. *Mar. Ins. Co.* (5 *John.* 299,) seem to show that he is also entitled to recover all the expenses fairly incurred in obtaining a restoration of the proceeds of the vessel, unless the freight and cargo also belonged to him; in which case those expenses would be the subject of general average in the first instance. (7 *John.* 425.)

Judgment for the plaintiff.